IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| RONALD D. RUSSO,<br><br>　　　　　　　　Plaintiff,<br><br>　　　vs.<br><br>BALLARD MEDICAL PRODUCTS, and<br>KIMBERLY-CLARK CORPORATION,<br><br>　　　Defendants. | ORDER & MEMORANDUM DECISION<br><br><br><br>Case No. 2:05 CV 59 |

Under the protection of a confidentiality agreement, Plaintiff Ronald D. Russo entered into negotiations with Defendant Ballard Medical Products concerning several inventions that Mr. Russo hoped Ballard would be interested in acquiring.  According to Mr. Russo, Ballard abandoned those negotiations and then impermissibly incorporated the information he had provided during the parties' discussions into the design of a medical device, named TrachCare 72, upon which Ballard ultimately received two patents.  Mr. Russo filed this suit seeking recovery for the alleged idea theft.

Before the court are five motions for summary judgment and numerous motions in limine.  The parties have provided extensive briefing and, at a hearing scheduled by the court, offered oral argument.  Now being fully advised, the court enters the following order.

**Summary Judgment Standard**

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

### Background

In light of the standard governing summary judgment motions, the following factual exposition is largely confined to matters that the parties do not dispute.  Any disputed facts will be identified.

*Mr. Russo and Ballard*

Mr. Russo spent many years of his professional career pursuing research and development goals for large corporations.  Currently, he supports himself as an independent inventor.  Mr. Russo does not manufacture his inventions, but rather attempts to sell or license them to corporations, which, in turn, handle the manufacturing and marketing of those inventions.

Before the present dispute arose, Mr. Russo contracted with Ballard to provide consulting services.  Around the same time, Mr. Russo and Ballard entered into a royalty agreement that provided Ballard with the option of utilizing three of Mr. Russo's patents relating to tracheal suction catheters.  Although the consulting agreement expired at the end of its one-year term, Ballard and Mr. Russo remained in contact, keeping the door open for future business dealings.

*Discussion Concerning Mr. Russo's New Inventions*

A few years following the expiration of the parties' consulting agreement, Mr. Russo and

Ballard began communicating about closed tracheal suction devices.  In correspondence with Ballard, Mr. Russo indicated that he had several pending patents that might interest Ballard.   Mr. Russo expressed his willingness to disclose information relating to his inventions under the protection of an appropriate confidentiality agreement.

Approximately a year following that correspondence, Todd Medley, a Ballard employee, contacted Mr. Russo to obtain a description of the technology Mr. Russo had mentioned to enable the parties to prepare a confidentiality agreement.  Mr. Russo provided the following titles for his inventions: (1) Protective Suction Control Catheter with Valve, (2) Thumb Conformable Suction Control Regulator, and (3) Two Part Closed Tracheal Suction System.  Mr. Russo informed Ballard that a patent for the Protective Suction Control Catheter with Valve had recently issued.  He also indicated that patents were pending on the other two inventions.

After receiving that information from Mr. Russo, Rick D. Lorenzen, another Ballard employee, helped prepare a Confidential Disclosure Agreement to facilitate further discussions with Mr. Russo about his inventions.  That agreement contained a forum-selection clause designating that "any action under this Agreement may be filed and maintained only in the state or federal courts located within Salt Lake County, State of Utah, and all parties hereby submit to jurisdiction of such courts."  (Confidential Disclosure Agreement, attached as Ex. 23 to Defs.' Memo. in Supp. of Their Mot. for Summ. J. (All Counts).)  Mr. Russo received, signed, and then returned the Confidential Disclosure Agreement to Ballard along with a binder of information on the three technologies the parties had been discussing.

*The Parties Meet*

About one month later, Mr. Russo had lunch with representatives from Ballard at Mickey Mantle's restaurant in New York City.  By that time, Mr. Russo had obtained a patent for the

Thumb Conformable Suction Control Regulator, leaving the Two Part Closed Tracheal Suction System as the only invention for which a patent was still pending.

The parties dispute exactly what occurred at the New York City lunch.  Mr. Russo alleges that the parties' discussion centered not on the materials that Mr. Russo had previously provided, but on a related improvement to the Two Part Closed Tracheal Suction System that Mr. Russo had developed.  According to Mr. Russo, the improvement was evidenced by a drawing titled "Drawing No. 4," which was one of four drawings he alleges he provided to Ballard during the New York City lunch.  Mr. Russo claims that he and Ballard discussed Drawing No. 4 in detail and that he not only provided Ballard with a copy of that drawing, but also produced a prototype incorporating the technology depicted in Drawing No. 4.  Ballard, in contrast, contends that the discussion at the New York City lunch was confined to the information contained in the binder Mr. Russo had previously provided to Ballard, and that no information outside of the scope of Mr. Russo's patents or his pending patent was discussed.  Ballard further alleges that Mr. Russo did not produce Drawing No. 4 at the lunch, provide it with a copy of that drawing, or produce a prototype incorporating the information contained in Drawing No. 4.

*Negotiations*

Approximately two months after the New York City lunch meeting, Mr. Russo obtained a patent for the Two Part Closed Tracheal Suction System.  Accordingly, by that time Mr. Russo held patents on the three inventions he had initially described to Ballard when the parties were preparing the Confidential Disclosure Agreement.

The parties agree that negotiations to acquire Mr. Russo's inventions began soon after the lunch meeting.  The parties diverge on the issue of just what Ballard was seeking to acquire.  Mr. Lorenzen asked Paul Hess, an in-house attorney for Ballard, to draft an agreement that would

provide Ballard with the option of acquiring the three patents that the parties had discussed.  Mr. Lorenzen's written request to Hess lists the three patents, including their corresponding patent numbers, and indicates that Mr. Russo should "provide all drawings in his possession" to Ballard within thirty days following the execution of the agreement.  (Note, July 10, 1998, attached as Ex. 29 to Defs.' Memo. in Supp. of Their Mot. for Summ. J. (All Counts).)  Ballard contends that its interest extended no farther than acquiring the right to the patents themselves, while Mr. Russo claims that Ballard was also seeking to acquire the information conveyed by Drawing No. 4.

During negotiations, some disagreement arose concerning the possibility that Mr. Russo's patent on his Two Part Closed Tracheal Suction System might infringe on earlier patents owned by Walter Jinotti.  Mr. Russo attempted to allay those concerns.  Ultimately, the parties failed to reach an agreement and abandoned negotiations.

*The Lawsuit*

Approximately five years after negotiations between Mr. Russo and Ballard broke down, Mr. Russo filed this lawsuit.  In his complaint, Mr. Russo alleges that Ballard eventually applied for and received patents for a medical device, the TrachCare 72, which impermissibly incorporate ideas he disclosed to Ballard while the parties were in negotiations.  Specifically, Mr. Russo contends that Ballard commercialized and patented Drawing No. 4, which he claims he provided to Ballard during the New York City lunch.

Mr. Russo originally filed suit in Rhode Island state court, alleging general idea-theft causes of action.  Ballard removed the suit to federal court and then, relying on the forum-selection clause contained in the Confidential Disclosure Agreement, filed a motion to dismiss the case or, alternatively, to transfer the suit to the State of Utah.  Mr. Russo opposed that motion

by arguing that the parties did not intend Drawing No. 4 to be covered by the Confidential

Disclosure Agreement and, therefore, the forum-selection clause did not apply to his causes of

action.  The district court in Rhode Island disagreed with Mr. Russo and held that the

Confidential Disclosure Agreement applied to Mr. Russo's claims.  The court then transferred

the case to Utah.  Following the transfer, Mr. Russo amended his complaint to allege that Ballard

had violated the terms of the Confidential Disclosure Agreement by impermissibly using the

information contained in Drawing No. 4.

### Analysis

Five separate summary judgment motions are now before the court for resolution.  First,

Mr. Russo seeks summary judgment on the issue of whether Defendants, considering the position

they took before the United States District Court of Rhode Island, are now precluded from

arguing that Drawing No. 4 is outside of the protections afforded by the Confidential Disclosure

Agreement.  Second, Ballard, relying on Mr. Russo's assertions in the Rhode Island proceeding

that Drawing No. 4 was not covered by the Confidential Disclosure Agreement, seeks summary

judgment on Mr. Russo's claim that Ballard breached that agreement by misappropriating

Drawing No. 4.  Third, Ballard has filed a motion for summary judgment on Mr. Russo's claims

of conversion and unjust enrichment, claiming those causes of action are preempted by Utah's

Uniform Trade Secrets Act.  Fourth, Kimberly-Clark, which acquired Ballard the year following

the New York City lunch meeting, seeks summary judgment on all claims against it, arguing that

a parent-subsidiary relationship alone is insufficient to establish liability.  Fifth, Defendants seek

summary judgment on all causes of action on the ground that Mr. Russo's claims require him to

meet certain federal inventorship standards that he cannot satisfy.

In addition to the summary judgment motions, the parties have filed numerous motions in

limine.  After addressing the pending motions for summary judgment, the court will turn to the parties' motions in limine.

**I. The Confidential Disclosure Agreement and Drawing No. 4**

While before the U.S. District Court of Rhode Island--with the potential operation of a forum-selection clause hanging in the balance--Mr. Russo and Defendants submitted argument to the court addressing whether the Confidential Disclosure Agreement applies to Drawing No. 4. Mr. Russo argued that the Confidential Disclosure Agreement was confined to the three patents expressly identified to Ballard and that Drawing No. 4 was therefore not covered by the agreement.  Defendants, assuming for the purposes of their motion that Drawing No. 4 was provided to Ballard, argued that the language of the Confidential Disclosure Agreement was broad enough to cover Drawing No. 4.  The U.S. District Court of Rhode Island concluded that the Confidential Disclosure Agreement applied to the claims in Mr. Russo's complaint and transferred the case to this court.

Now, although not styled as such, the parties have essentially filed cross-motions for summary judgment on the issue of whether Drawing No. 4, assuming it was provided to Ballard, is covered by the Confidential Disclosure Agreement.  Somewhat ironically, the parties have switched positions on this issue following the entry of the U.S. District Court of Rhode Island's transfer order.  Mr. Russo, fully embracing the decision of U.S. District Court of Rhode Island, has now amended his complaint to allege that Ballard breached the Confidential Disclosure Agreement by misappropriating Drawing No. 4.  Citing the doctrine of judicial estoppel, Mr. Russo has moved the court for a summary judgment order precluding Defendants from arguing that Drawing No. 4 is not covered by the Confidential Disclosure Agreement.

Defendants assert that the opposite result is more appropriate, and have requested

7

summary judgment on Mr. Russo's claim that Ballard breached the Confidential Disclosure

Agreement.  Defendants justify this position by arguing that the U.S. District Court of Rhode

Island did not conclude that Drawing No. 4 is covered by the Confidential Disclosure Agreement

and  that Mr. Russo has judicially admitted that Drawing No. 4 is not covered by the Confidential

Disclosure Agreement.  According to Defendants, Mr. Russo's judicial admission regarding the

scope of the Confidential Disclosure Agreement warrants dismissal of Mr. Russo's claim that

Ballard breached that agreement by misappropriating Drawing No. 4.

*Judicial Estoppel*

The Tenth Circuit has explained the doctrine of judicial estoppel in the following manner:

[W]here a party assumes a certain position in a legal proceeding, and succeeds in
maintaining that position, he may not thereafter, simply because his interests have
changed, assume a contrary position, especially if it be to the prejudice of the
party who has acquiesced in the position formerly taken by him.

Johnson v. Lindon City Corp., 405 F.3d 1065, 1069 (10th Cir. 2005) (internal quotation omitted).

Judicial estoppel operates "to protect the integrity of the judicial process by prohibiting parties

from deliberately changing positions according to the exigencies of the moment."  New

Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (internal quotation and citations omitted).

Mr. Russo argues that the doctrine should operate here to prevent Defendants from

altering their position with respect to the scope of the Confidential Disclosure Agreement.  In

response, Defendants argue that judicial estoppel is inapplicable because the U.S. District Court

of Rhode Island did not accept Defendants' argument that the Confidential Disclosure

Agreement applied to Drawing No. 4.  Although it has become increasingly clear that Mr.

Russo's claims against Defendants are confined to the misappropriation of Drawing No. 4,

Defendants argue that Mr. Russo's causes of action were not so clearly defined when the parties

were before the U.S. District Court of Rhode Island.  In fact, an entirely different complaint was

8

at issue in those proceedings because the Second Amended Complaint, which now governs this case and expressly mentions Drawing No. 4, was not filed until after the suit was transferred to Utah.  Accordingly, Defendants assert that the U.S. District Court of Rhode Island believed that Mr. Russo was claiming misappropriation of information directly relating to his pending patents as well as Drawing No. 4. That belief led the court to transfer the case because it considered the general subject matter of Mr. Russo's claims to fall within the scope of the Confidential Disclosure Agreement.  Under Defendants' approach, the transfer order cannot be fairly read as making a specific conclusion about Drawing No. 4's relation to the Confidential Disclosure Agreement.

A review of the U.S. District Court of Rhode Island's written decision, as well as the parties' written submissions and argument before that court, establish that the court did conclude that Drawing No. 4 is covered by the Confidential Disclosure Agreement.  Although the complaint that Mr. Russo originally filed in Rhode Island was notably less exact in its claims than the Second Amended Complaint that now governs these proceedings, it is beyond doubt that the U.S. District Court of Rhode Island was aware that Mr. Russo's claims were highly focused, if not wholly confined, to the alleged misappropriation of Drawing No. 4.

Further, the transcript of the oral argument held before the U.S. District Court of Rhode Island leaves little doubt concerning Defendants' position relating to the applicability of the Confidential Disclosure Agreement to Drawing No. 4.  During oral argument on Defendants' motion to dismiss or transfer Mr. Russo's suit to Utah, counsel for Defendants stated:

> [Russo] next argues at page four of his opposition brief, well, the confidential disclosure agreement wasn't intended to cover drawings 1 through 4. It was really only intended to cover the patent application itself, which he says is separate and unrelated.
>
> And that argument is defective as well, your Honor.  Remember the

9

> confidential agreement, the confidential disclosure agreement defines confidential information as all disclosures of information relating to the inventions.  <u>It is as clear as day that those four drawings relate to his inventions.</u>

(Transcript of May 25, 2004 Hearing 10, attached as Ex. C to Req. for Jud. Notice in Supp. of Plf.'s Mot. for Part. Summ. J. (emphasis added).)  Additionally, the transcript reveals the court's understanding that Drawing No. 4 was the crucial component of Mr. Russo's claims against Defendants.  When questioning Joseph Kelly, who represented Mr. Russo at the hearing, the following exchange took place:

> THE COURT: What do you claim was stolen here?  What idea was stolen? What's contained in Drawing 4?
>
> MR. KELLY: Drawing number 4.
>
> THE COURT: That's the whole basis of your claim in this case?
>
> MR. KELLY: Yes. That's the whole basis of the claim.

(<u>Id.</u> at 27.)

After considering the representations and arguments offered by the parties, the U.S. District Court of Rhode Island, relying on the language of the Confidential Disclosure Agreement, concluded that "the evidence points in one direction only, i.e., that the clause was intended to apply to all claims arising out of the exchange of information that took place at the [New York City lunch] meeting."  (Decision & Order, attached as Ex. C to Req. for Jud. Notice in Supp. of Plf.'s Mot. for Part. Summ. J.)  The ruling of the U.S. District Court of Rhode Island leaves little room for argument.  The court concluded that all confidential information exchanged during the New York City lunch was covered by the Confidential Disclosure Agreement.  It inescapably follows that if Mr. Russo produced Drawing No. 4 at that lunch, the court considered that drawing covered by the parties' confidentiality agreement.  In short, the U.S. District Court of Rhode Island was persuaded by Defendants' argument concerning the broad scope of the

10

Confidential Disclosure Agreement and adopted the position for which Defendants had lobbied.

What is less clear is whether the doctrine of judicial estoppel operates in this context to prevent the arguments concerning the Confidential Disclosure Agreement now advanced by Defendants.  Historically, the doctrine of judicial estoppel has not been warmly embraced by the Tenth Circuit.  See, e.g., Johnson, 405 F.3d at 1068-69 ("[T]his circuit has repeatedly refused to apply this principle [judicial estoppel] . . . . (citations omitted)); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (Westlaw 2006) ("The lack of clear Supreme Court direction until the new century left the Tenth Circuit free to repeatedly deny any recognition of judicial estoppel . . . .").  But in Johnson, the Tenth Circuit recognized that the United States Supreme Court's use of judicial estoppel in the case of New Hampshire, 532 U.S. 742, "altered the legal landscape," and that the Tenth Circuit was obligated to "follow the guidance of the Court's binding precedent."  Johnson, 405 F.3d at 1069 (citing United States v. Hernandez-Rodriguez, 352 F.3d 1325, 1333 (10th Cir. 2003)).  Accordingly, the court applied the doctrine.  See id.

Johnson involved circumstances distinguishable from this case, however, because that case involved two completely separate legal proceedings.  In Johnson, the Tenth Circuit affirmed the entry of summary judgment against two plaintiffs who had alleged that their constitutional rights were violated when they were wrongfully arrested and imprisoned.  Id. at1067-68.  The court held that summary judgment was appropriate because, after their arrest, the two plaintiffs entered pleas in abeyance in which they admitted they had committed assault.  Id. at 1068-69.

Similarly, in New Hampshire, the case that caused the Tenth Circuit to alter the course of its judicial estoppel jurisprudence, the Court applied the doctrine to prevent the State of New Hampshire from deviating from an interpretation of a boundary determination that New

11

Hampshire has previously accepted in litigation occurring nearly thirty years earlier.  532 U.S. at

755 ("Having convinced this Court to accept one interpretation of 'Middle of the River,' and

having benefitted from that interpretation, New Hampshire now urges an inconsistent

interpretation to gain an additional advantage at Maine's expense.").

Both <u>Johnson</u> and <u>New Hampshire</u> addressed situations involving multiple judicial

proceedings.  Here, in contrast, Mr. Russo is requesting that the court apply the doctrine to

prevent Defendants from taking a different position in the same proceeding.  Faced with a similar

situation, the court in <u>Tuff-N-Rumble Management, Inc. v. Sugarhill Music Publishing, Inc.</u>, 99

F. Supp. 2d 450, 457 n. 3 (S.D.N.Y. 2000), declined to apply judicial estoppel.  The court first

noted that "[t]he Second Circuit has never held that judicial estoppel can apply to inconsistent

positions in the same proceeding . . . ."  <u>Id.</u>  The court went on to state that judicial estoppel "is

not looked upon very favorably in the Second Circuit, and there are good reasons for not

extending it to cover inconsistencies in the same proceeding."  <u>Id.</u>  The primary rationale the

court advanced for not extending judicial estoppel to inconsistencies occurring within the same

proceeding was the tension between the doctrine and liberal pleading standards, which allow

parties to pursue alternative theories.  <u>See id.</u>; <u>see also</u> <u>Cayuga Indian Nat. of New York v.</u>

<u>Pataki</u>, 188 F. Supp. 2d 223, 234 (N.D.N.Y. 2002) (similarly declining to apply judicial estoppel

when a party asserted inconsistent positions in the same legal proceeding).

Other courts have applied the doctrine when a party attempts to take inconsistent

positions in the same proceeding.  For example, in <u>Continental Illinois Corp. v. C.I.R.</u>, 998 F.2d

513 (7th Cir. 1993), the Seventh Circuit stated:

> It is true that the doctrine [of judicial estoppel] is usually applied to successive
> suits, <u>Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.</u>, 910 F.2d
> 1540, 1547-48 (7th Cir. 1990), but it is not so limited.  <u>Witham v. Whiting Corp.</u>,
> 975 F.2d 1342, 1345 (7th Cir. 1992).  A party can argue inconsistent positions in

> the alternative, but once it has sold one to the court it cannot turn around and repudiate it in order to have a second victory, which is what the IRS is seeking here.

Id. at 518; see also Ergo Science, Inc. v. Martin, 73 F.3d 595, 598-99 (5th Cir. 1996) (applying judicial estoppel to bar a position inconsistent with that asserted by the party earlier in the action).  The United States Supreme Court has also articulated, although in dicta, a formulation of the judicial estoppel rule that allows for its operation when a party takes a position inconsistent with that taken earlier in the same proceeding.  See Pegram v. Hendrich, 530 U.S. 211, 227 n. 8 ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.").

The Seventh Circuit's approach to judicial estoppel is compelling.  It recognizes the policy served by liberal pleading standards and provides parties the ability to pursue alternative theories, but also recognizes that once a court has accepted a party's position, that party should not be allowed to, in essence, pull the rug out from under a court's prior ruling.

The record in this case establishes that Defendants' urged the U.S. District Court of Rhode Island to hold that, assuming Mr. Russo provided Drawing No. 4 to Ballard, that disclosure was covered by the Confidential Disclosure Agreement.  The court agreed with Defendants and transferred this case to Utah.  After that transfer, Mr. Russo, relying on Defendants' position before the U.S. District Court of Rhode Island and on the written order issued by that court, amended his complaint to allege a cause of action for breach of the Confidential Disclosure Agreement.  Defendants cannot now change positions to seek "a second victory" at the expense of U.S. District Court of Rhode Island and Mr. Russo.

Given the foregoing, Defendants are estopped from arguing that Drawing No. 4 is outside of the protection offered by the Confidential Disclosure Agreement.  But that estoppel does not

13

change the reality that the applicability of the Confidential Disclosure Agreement to Drawing No. 4 is dependent on whether Mr. Russo provided that drawing to Ballard during the New York City lunch.  Defendants are free, of course, to challenge Mr. Russo's assertions that he did provide that drawing.

Given the foregoing analysis, Plaintiff Ronald D. Russo's Motion for Partial Summary Judgment that Drawing No. 4 Is Covered by the Confidential Disclosure Agreement is GRANTED and Defendants' Cross Motion for Summary Judgment on Count II is DENIED.

## II. Preemption of State Law Claims

Defendants have requested summary judgment on Mr. Russo's claims of conversion and unjust enrichment, arguing that those claims are preempted by the Utah Uniform Trade Secrets Act ("UTSA").  Mr. Russo responds that summary judgment on those claims is inappropriate because he should be allowed to pursue his common law causes of action in the event he fails to establish that the allegedly misappropriated information constitutes a trade secret.

The UTSA states that it "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret."  Utah Code Ann. § 13-24-8 (2004).  There are no published cases in Utah that address the preemptive effect of the UTSA.

Defendants argue that case law from other jurisdictions require a plaintiff alleging trade secret misappropriation to plead facts beyond the scope of the trade secrets cause of action if they desire to avoid preemption.  (See Defs.' Reply Memo. in Supp. of Their Mot. for Summ. J. on Counts III & IV 2 ("Simply put, [Mr.] Russo's conversion and unjust enrichment claims . . . are based exclusively on his allegations of trade secret misappropriation.  They are, therefore, preempted by the UTSA and should be dismissed with prejudice.").)

The great weight of authority runs contrary to Defendants' assertion.  Indeed,

14

Defendants' approach is somewhat paradoxical: they deny that Drawing No. 4 meets the definition of a trade secret, but claim that Mr. Russo's claims of conversion and unjust enrichment are preempted by the UTSA, a statute that only provides relief if there is actual or threatened misappropriation of a "trade secret."  See Utah Code Ann. §§ 13-24-2 to -4.  In other words, Defendants' claim that Mr. Russo's causes of action are preempted by a statute that grants him no cause of action.

The more appropriate approach is to interpret the UTSA as displacing other remedies to the extent that allegedly misappropriated information constitutes a "trade secret," as that term is defined by the UTSA.  In fact, this approach is consistent with the plain language of the UTSA, which provides that "other civil remedies that are not based upon misappropriation of a trade secret" are not preempted.  Id. § 13-24-8(2)(b).  If it is established that Drawing No. 4 is not a trade secret, then it follows that Mr. Russo's claims of conversion and unjust enrichment will not be based on misappropriation of a trade secret.

This understanding of the preemption question is consistent with that used by the Eleventh Circuit in Penalty Kick Management Ltd. v. Coca Cola Co., 318 F.3d 1284 (11th Cir. 2003).  In Penalty Kick, the court noted that Georgia courts had interpreted Georgia's trade secret act, the relevant language of which is identical to the UTSA, as preempting a conversion claim "'to the extent' the claim addresses a trade secret."  Id. at 1297.  Because the plaintiff in Penalty Kick successfully established that the information misappropriated was, in fact, a trade secret, the plaintiff's alternatively pleaded civil remedies were preempted.  Id. at 1298.

Similarly, in Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc., 318 F. Supp. 2d 216 (D. Del. 2004), the court recognized that state trade secret law would only preempt other legal remedies if it was, in fact, a trade secret that was misappropriated.  See id. at 219-20 ("[I]f a

15

fact finder were to find that the processes and formulas . . . are Dunlop's trade secrets . . . then Dunlop's common law claims for conversion and unjust enrichment are preempted . . . .").

At oral argument, counsel for Mr. Russo agreed that Mr. Russo's conversion and unjust enrichment claims will be preempted if he is able to establish that Drawing No. 4 constituted a trade secret. Because the resolution of that issue is still in some doubt, it is too early to know if Mr. Russo's conversion and unjust enrichment claims are "based upon misappropriation of a trade secret," Utah Code Ann. § 13-24-8(2)(b), and therefore preempted.

Accordingly, Defendants' Motion for Summary Judgment on Counts III and IV is DENIED.

### III. Kimberly Clark

Kimberly Clark claims that it is entitled to summary judgment on all claims that Mr. Russo has alleged against it. In support of its position, Kimberly Clark argues that the only manner in which it is implicated by Mr. Russo's claims is that it purchased Ballard approximately one year after the New York City lunch meeting and is now the parent corporation of Ballard. This motion is essentially a continuation of a motion to dismiss that Kimberly Clark filed earlier in this litigation.

In opposing that earlier motion, Mr. Russo argued that his use of the plural "Defendants" in the Second Amended Complaint, included Kimberly Clark as a defendant in Mr. Russo's UTSA, conversion, and unjust enrichment claims. Although Mr. Russo earlier indicated that he would attempt to find Kimberly Clark liable on alter-ego grounds, he now argues that Kimberly Clark is an appropriate defendant because it sells the TrachCare 72 product, which Mr. Russo alleges impermissibly incorporates information he disclosed to representatives of Ballard. Mr. Russo contends that because Kimberly Clark knew or should have known that the product it is

16

selling incorporates ill-gotten intellectual property, Kimberly Clark is liable to Mr. Russo.

In support of his assertion, Mr. Russo relies on the deposition testimony of Gerry Arambula, who is involved with marketing and selling the TrachCare 72.  Throughout his deposition, Mr. Arambula consistently refers s to "Kimberly Clark" when discussing the marketing and selling of the TrachCare 72 and makes no distinction between the many subsidiaries of Kimberly Clark that incorporate "Kimberly Clark" into their name.

Presumably to counter Mr. Russo's reliance on the deposition testimony of Mr. Arambula, Kimberly Clark, in its reply memorandum, provided documentary exhibits indicating that a subsidiary named Kimberly-Clark Global Sales, Inc. handles sales of the TrachCare 72. Notably, Kimberly Clark did not submit any affidavits declaring that Kimberly Clark does not participate in sales activity related to the TrachCare 72.[1]

"Summary judgment is a drastic remedy [and] any relief pursuant to Fed. R. Civ. P. 56 should be awarded with care."  Conway v. Smith, 853 F.2d 789, 792 n. 4 (10th Cir. 1988) (citing Jones v. Nelson, 484 F.2d 1165, 1168 (10th Cir. 1973)).  "Unless the moving party can demonstrate his entitlement beyond a reasonable doubt, summary judgment must be denied." Id. (citing Norton v. Liddel, 620 F.2d 1375, 1381 (10th Cir. 1980)).

The current state of the evidentiary record does not support granting Kimberly Clark's motion for summary judgment.  Although Kimberly Clark provided documents indicating that Kimberly-Clark Global Sales, Inc. handles sales activity relating to the TrachCare 72, those

---

[1]The court notes that two days following the hearing on this motion, Kimberly Clark enclosed two declarations in a letter sent directly to the court's chambers.  Mr. Russo promptly filed a motion to strike those declarations.  Federal Rule of Civil Procedure 6(d) specifies that "[w]hen a motion is supported by affidavit, the affidavit shall be served with the motion."  Fed. R. Civ. P. 6(d).  Because the declarations submitted by Kimberly Clark are untimely, the court will not consider them in resolving this motion and Mr. Russo's motion to strike those declarations is granted.

documents do not preclude the possibility that Kimberly Clark engages in some sales activity

relating to the TrachCare 72.  Further, the deposition testimony of Mr. Arambula only serves to

illustrate the present confusion concerning Kimberly Clark's involvement with the TrachCare 72.

Accordingly, Defendant Kimberly-Clark Corporation's Motion for Summary Judgment is

DENIED.

**IV. Federal Inventorship Standards**

Although Mr. Russo alleges that Ballard impermissibly utilized his trade secret and

ultimately obtained patents that incorporated that trade secret, Mr. Russo has asserted no causes

of action that allege violations of patent law.  Nevertheless, Defendants claim that they are

entitled to summary judgment on all of Mr. Russo's claims because Mr. Russo cannot satisfy the

prior conception requirement applicable to patent law claims.

According to Defendants, Mr. Russo's claims in this case are all contingent on a finding

that Mr. Russo was the true inventor of the technology claimed in Ballard's patents.  Defendants

argue that patent law standards apply to this case because "[w]here a state law cause of action

'hinges' on finding a party to be the true inventor of a patented invention, federal patent law

preempts the state law claim to the extent of requiring federal patent law to govern the standard

of proving prior inventorship."  (Defs.' Memo. in Supp. of Their Mot. for Summ. J. (All Counts)

2.)  Defendants rely almost exclusively on University of Colorado Foundation v. American

Cyanamid Co., 196 F.3d 1366 (Fed. Cir. 1999), for this proposition.

In Cyanamid, the court addressed whether the federal patent law standard of inventorship

should be used to determine whether the plaintiffs in that case could pursue state law claims of

fraudulent nondisclosure and unjust enrichment.  The plaintiffs were a research university and

two doctors employed by that university.  The doctors alleged that they invented a product that

18

was ultimately patented by Cyanamid without their knowledge.  The Federal Circuit analyzed the claims of the doctors separately from those of the university.  The court held that the doctors' claims were not preempted by federal patent law.

> Although the Doctors had no patent rights to reformulated Materna at the time of the suit, their state law claims are not simply an attempt to enforce property rights. Instead, the fraudulent nondisclosure claim springs from Cyanamid's alleged duty to inform the Doctors of the patent application.  Similarly, the unjust enrichment claim springs not from an attempt to enforce intellectual property rights, but instead from Cyanamid's alleged wrongful use of the Doctors' research results. Therefore, . . . federal patent law does not preempt these state law claims.

Id. at 1371-72.

In contrast, the court concluded that the university's fraudulent nondisclosure and unjust enrichment claims "depend[ed] on the Doctors' status as inventors.  Id. at 1372 (emphasis added).  The court provided no substantive analysis explaining why the doctors' nondisclosure claim was not predicated upon a finding that they were the true inventors of the patent, while the university's claim was predicated upon such a showing.  See id.  But a close reading of Cyanamid reveals that the Federal Circuit's preemption analysis was focused on addressing whether the plaintiffs were attempting to use state law as a substitute for the property interest protection offered by federal patent law.  See id.; see also Univ. of Colo. Found. v. Am. Cyanamid Co., 342 F.3d 1298, 1305-06 (Fed. Cir. 2003) (explaining that the court's earlier ruling on appeal was focused on whether the plaintiffs, by pursuing state law claims were attempting to seek property rights inconsistent with those offered by federal patent law).

Mr. Russo is not alleging any causes of action that directly implicate the validity of Ballard's patents or would otherwise affect Ballard's property interests in those patents.  In contrast, the plaintiffs in Cyanamid, in addition to pursuing state law claims, also sought to add names to the patent and to modify ownership.  In this regard, Cyanamid is similar to Stern v.

Trustees of Columbia University, 434 F.3d 1375 (Fed. Cir. 2006), also relied upon by the

Defendants in this case.

In Stern, the Federal Circuit affirmed a district court's dismissal of a plaintiff's state law

claims, including a claim for unjust enrichment, after concluding that the plaintiff had not

established that he was a co-inventor of the patent. Id. at 1378. In that case, the plaintiff

specifically brought a claim requesting that his name be added as a co-inventor to the patent. Id.

at 1377. A review of the district court's opinion reveals that the plaintiff's state law claims made

specific reference to duties owed to a co-inventor. See id. In other words, in Stern, the court

applied federal patent law because the plaintiff was expressly seeking a modification to a patent.

Because the plaintiff in Stern linked his state law claims to his status as a co-inventor of the

patent, a status the plaintiff was unable to establish, the district court was able to dismiss the

plaintiff's state law claims.

While Cyanamid and Stern do provide some indication of the possibility of preemption in

a situation like that present here, other precedent from the Federal Circuit establishes that

preemption is inappropriate in this case. In fact, the Federal Circuit has indicated that the

concept of independent corroboration, a component of the federal inventorship standard, is not

applicable to a state trade secret claim. In C&F Packing Co. v. IBP, Inc., 224 F.3d 1296 (Fed.

Cir. 2000), a case involving alleged trade secret misappropriation, the court declined to utilize

the federal corroboration standard, stating that

> [p]atent interference law . . . is concerned with priority of invention and does not
> set the standard for detecting the existence of a trade secret. In a priority contest it
> is the timing of inventive activities and the diligence of a putative inventor that is
> in issue, not the existence of the invention itself. Rather than apply inapposite
> patent law requirements, this court looks to the trade secret law of the relevant
> state in misappropriation cases.

Id. at 1301 (internal citation omitted).

20

The Federal Circuit has also previously declined to exercise jurisdiction over an alleged

trade secret misappropriation dispute, even though the party that allegedly misappropriated the

trade secret later obtained a patent incorporating that trade secret.  See Uroplasty, Inc. v.

Advanced Uroscience, Inc., 239 F.3d 1277, 1279 (Fed. Cir. 2001).  In Uroplasty, a former

employee of Uroplasty, Inc. allegedly used the company's trade secrets to obtain a patent on

certain technology.  See id.  The former employee represented that he was a co-inventor of the

technology.  Id.  The Federal Circuit stated:

> The only mention of a patent in Uroplasty's well-pleaded complaint are the
> allegations that Lawin used and divulged Uroplasty's trade secrets and
> confidential information by acts that included the preparation and filing of the
> application for the 406 patent and his involvement in the testing of urological
> bulking agents described in the patent.  The 406 patent may be evidence in
> support of Uroplasty's allegations, but the mere presence of the patent does not
> create a substantial issue of patent law.

Id.  The court went on to point out that "Uroplasty's claims for trade secret misappropriation

require it to show that Lawin disclosed or used its trade secrets or confidential information, a

burden that can be met without requiring the resolution of a substantial issue of patent law."  Id.

To determine if federal law preempts Mr. Russo's claims in this case, "the key is whether

the operation of state law 'stands as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress.'"  See Cyanamid, 342 F.3d at 1305 (quoting Kewanee Oil

Co. v. Bicron Corp., 416 U.S. 470, 479 (1974) (internal quotation marks and citation omitted)).

Mr. Russo has not claimed that Defendants violated any patent laws and has not invoked any

relief provided by those laws.  Further, Mr. Russo does not seek to invalidate or otherwise alter

the Ballard patents at issue.  In short, property interests protected by federal patent law are not

implicated in the present suit and federal patent law will therefore not operate to preempt the

state law governing Mr. Russo's claims.  Additionally, application of federal patent standards in

21

situations like those present here would only serve to encourage parties that misappropriate trade secret information to run to the patent office to drastically increase the applicable burden of proof should an injured party choose to seek judicial relief for the misappropriation, an undesirable result.

Accordingly, Defendants' Motion for Summary Judgment (All Counts) is DENIED.

## V. Motions in Limine

As indicated, in addition to the summary judgment motions just discussed, there are multiple motions in limine now pending before the court.

A.      *Motion to Exclude Evidence Relating to Mr. Russo's 1978 Resume*

In 1978, Mr. Russo falsely indicated on a resume that he received a Masters Degree in mechanical engineering from the University of Rhode Island.  During his deposition, Defendants confronted Mr. Russo about his misrepresentation.  Mr. Russo now requests an order precluding Defendants from questioning Mr. Russo about the misrepresentation and prohibiting the introduction of the resume into evidence.  Defendants oppose the motion, arguing that the misrepresentation has substantial relevance to this case because it indicates that Mr. Russo has previously been willing to falsify information relating to his professional activities.

Rule 608 of the Federal Rules of Evidence provides that specific instances of conduct may "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness." Fed. R. Evid. 608(b).  But the allowance of such an inquiry is constrained by rule 403 of the Federal Rules of Evidence.  See United States v. Leake, 642 F.2d 715, 718 (4th Cir. 1981) ("[Rule 608(b)] recognizes that the trial court must have discretion to apply the overriding safeguards of rule 403 . . . .").  Rule 403 allows the court to exclude relevant evidence

if the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  In assessing the probative value of evidence covered by rule 608(b), courts consider (1) the importance of the witness's credibility to the case, (2) whether the evidence is probative of other matters at issue in the parties' larger dispute, (3) the similarity of the past specific conduct and the situation in which the witness is offering testimony, and (4) the remoteness of the specific act.  See State v. Gomez, 2002 UT 120, ¶ 35, 63 P.3d 72 (citing 28 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6118, at 94-96 (1993)).

While there is no doubt that Mr. Russo's credibility is critical to the resolution of this case, the misrepresentation on his resume is markedly different from the key issue here: whether Mr. Russo would falsify documents, lie, and misrepresent facts to a court of law in an effort to claim ownership of an alleged trade secret.  Also, Mr. Russo's misrepresentation on his resume occurred nearly thirty years ago, which significantly diminishes the probative value of the misrepresentation to the present case.  See Ad-Vantage Tel. Dir. Consults., Inc. v. GTE Dirs. Corp., 37 F.3d 1460, 1464-65 (11th Cir. 1994) (concluding that forgery accusation that occurred over twenty years in the past "was certainly too weakly probative to survive Rule 403's balancing test . . . .  Temporally remote acts are only weakly probative of the witness's current credibility . . . [and] the risk that the jury would place undue emphasis on it was great.").

Because the probative value of Mr. Russo's false statement on his 1978 resume is substantially outweighed by the possibility of unfair prejudice, Plaintiff Ronald D. Russo's Motion In Limine to Exclude Evidence Concerning Russo's 1978 Resume is GRANTED.

B.      *Motion to Exclude Evidence Relating to the Interpretation of the Confidential Disclosure Agreement*

Mr. Russo requests an order prohibiting Defendants from introducing statements made by Mr. Russo addressing his understanding of the scope of the Confidential Disclosure Agreement. As previously discussed, when this case was before the U.S. District Court of Rhode Island, Mr. Russo argued that the Confidential Disclosure Agreement was not intended to apply to the disclosure of Drawing No. 4.  After the U.S. District Court of Rhode Island ruled that the plain language of that agreement did encompass Drawing No. 4, Mr. Russo adopted that interpretation and now claims that Ballard breached the Confidential Disclosure Agreement by misappropriating Drawing No. 4.

Defendants oppose Mr. Russo's motion to exclude evidence of his initial understanding of the Confidential Disclosure Agreement by referencing their own motion for summary judgment concerning the scope of that agreement.  Defendants claim that Mr. Russo's prior statements are admissible to aid in the interpretation of the Confidential Disclosure Agreement and evidence the parties' intent to not apply confidentiality protections to Drawing No. 4.

For reasons already discussed, Defendants are judicially estopped from arguing that the Confidential Disclosure Agreement does not apply to Drawing No. 4.  Because evidence relating to Mr. Russo's initial understanding of the scope of that agreement are only relevant to further an argument that Defendants are judicially estopped from pursuing, it is proper to exclude such evidence.  Further, admission of that evidence would unfairly prejudice Mr. Russo because it would tend to undermine the legitimacy of his claim that Ballard breached the Confidential Disclosure Agreement, a claim that Mr. Russo asserted in reliance on the analysis of the Confidential Disclosure Agreement provided by the U.S. District Court of Rhode Island.

Accordingly, Plaintiff Ronald D. Russo's Motion In Limine to Exclude Extrinsic

24

Evidence Concerning the Interpretation of the Confidential Disclosure Agreement is GRANTED.

C.      *Motion to Exclude Testimony of Patent Attorney Bern S. Broadbent*

Mr. Russo requests an order precluding patent attorney Bern S. Broadbent from testifying as an expert witness. Mr. Russo claims that Mr. Broadbent's expert report (1) improperly weighs the evidence, (2) impermissibly purports to state what technical documents disclose and do not disclose, and (3) provides legal statements that are the proper province of the court.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), require district courts to ensure that offered expert testimony is "not only relevant, but reliable," Daubert, 509 U.S. at 589. To adequately discharge this gatekeeping function, the court must "undertake whatever inquiry is necessary to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1243 (10th Cir. 2000) (quoting Kumho Tire, 526 U.S. at 152).

A significant portion of Mr. Broadbent's report states his legal conclusions regarding the applicability of federal patent law to Mr. Russo's claims and discuss whether Ballard had a legal duty to disclose the "prior art" of Mr. Russo when applying for the patents implicated in this case. But it is the task of the court to instruct the jury on the applicable law. See United States v. Vreeken, 803 F.2d 805, 809 (10th Cir. 1988) (stating that questions of law "are the subject of the court's instructions and not the subject of expert testimony"). Accordingly, Mr. Broadbent's opinion that federal patent law governs resolution of Mr. Russo's claims and his conclusions regarding the duty to disclose prior art will not be admitted into evidence.

Without additional information, the court is unable to rule on the admissibility of Mr.

25

Broadbent's testimony except as provided above.  As a result, the court has scheduled a hearing

at which Mr. Broadbent will appear so that the court may assess Mr. Broadbent's qualifications

and hear the testimony that he intends to provide at trial.  After that hearing, the court will be

able to rule on the outstanding questions of admissibility.

Therefore, the court takes this motion under advisement and will issue a ruling on the

matters not expressly addressed above after the scheduled hearing.

D.      *Motion to Exclude Testimony of Gordon W. Lassen*

Defendants have indicated that they plan on calling Gordon W. Lassen to testify and

demonstrate a variety of medical devices that are similar to the TrachCare 72, the device at issue

in this case.  Mr. Russo objects to the admission of testimony from Mr. Lassen on relevancy

grounds to the extent that his testimony relates to products not directly implicated by Mr.

Russo's claims.  Mr. Russo also argues that the testimony should be excluded under rule 403 as

more likely to confuse the jury than provide probative information.[2]

Daubert, 509 U.S. 579, and Kumho Tire, 526 U.S. 137, require district courts to ensure

that offered expert testimony is "not only relevant, but reliable," Daubert, 509 U.S. at 589.  To

adequately discharge this gatekeeping function, the court must "undertake whatever inquiry is

necessary to 'make certain that an expert, whether basing testimony upon professional studies or

personal experience, employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field.'" Smith v. Ingersoll-Rand Co., 214

---

[2]Mr. Russo also claims that Mr. Lassen's expert report was untimely and should be
stricken.  Mr. Lassen's report was served on the last day for rebuttal reports, and, admittedly,
does not rebut any report submitted by Mr. Russo.  But Mr. Russo had the opportunity to depose
Mr. Lassen and it does not appear that any prejudice was caused by the potentially late
submission of his report.  Therefore, the court will not strike Mr. Lassen's report on timeliness
grounds.

F.3d 1235, 1243 (10th Cir. 2000) (quoting Kumho Tire, 526 U.S. at 152).

Without knowing the extent of Mr. Lassen's expected testimony, a ruling on Mr. Russo's motion is inadvisable at this time. The court will set aside a time either before or soon after the trial in this matter is scheduled to begin and will hear the proposed testimony outside the presence of the jury. After hearing the testimony, the court will make an appropriate ruling. Until that time, this motion is taken under advisement.

E.    *Motion to Exclude Evidence Relating to Nondisclosure of Prior Art Developed by Mr. Russo*

Through this motion, Defendants seek to preclude Mr. Russo from introducing evidence that Ballard failed to disclose "prior art" in its patent applications covering the TrachCare 72. Both Mr. Russo and an expert retained by Mr. Russo, Harry F. Manbeck, Jr., would testify that Ballard had a duty to disclose the prior art evidenced by one Mr. Russo's patents and that Drawing No. 4, if possessed by Ballard before the filing of their patent applications, should have similarly been disclosed.

Defendants argue that any nondisclosure of prior art is irrelevant to Mr. Russo's claims. Evidence of nondisclosure of prior art is typically confined to situations where a plaintiff is seeking to establish inequitable conduct. "Inequitable conduct occurs when a patentee breaches his or duty to the [United States Patent and Trademark Office ("PTO")] of candor, good faith, and honesty." Warner-Lambert Co. v. Teva Pharms. USA, Inc., 418 F.3d 1326, 1342 (Fed. Cir. 2005) (internal quotation omitted). "While inequitable conduct includes affirmative misrepresentations of material facts, it also arises when the patentee fails to disclose material information to the PTO." Ferring B.V. v. Barr Labs., Inc., 437 F.3d 1181, 1186 (Fed. Cir. 2006). "[Inequitable conduct] is a serious charge, and the effect is that an otherwise valid and invariably valuable patent is rendered unenforceable, for the charge arises only as a defense to patent

infringement." Id. at 1195 (Newman, J., dissenting).

As already discussed, Mr. Russo has not challenged the validity of Ballard's patents in any manner.  But Mr. Russo contends that evidence concerning the nondisclosure is admissible under rule 404(b) of the Federal Rules of Evidence because the nondisclosure shows that Ballard had "intent" to misappropriate Mr. Russo's trade secret and a "plan" to accomplish the misappropriation.

In support of his position, Mr. Russo cites Semiconductor Energy Laboratory Co. v. Samsung Electronics, Co., 4 F. Supp. 2d 477 (E.D. Vir. 1998).  In that case, the court allowed evidence of inequitable conduct on the part of one party--in relation to a patent that was not directly challenged in the litigation--to support a claim that a different patent was invalid.  Id. at 486-87.  The court took pains to note that its conclusion that inequitable conduct rendered the challenged patent invalid was not based on evidence of inequitable conduct with regard to a related, unchallenged patent.  Id. at 487 n.16.  The court explained,

> that conduct relating to the prosecution of the '636 is the sole basis for a finding
> of inequitable conduct, but that conduct relating to the '132 is relevant and
> probative as it provides important context, given the close relation of the patents
> and as it sheds light on the intent underlying the conduct relating to the
> prosecution of the '636 patent.

Id.

Evidence of Ballard's alleged nondisclosure of prior art satisfies the liberal relevancy requirement established by the Federal Rules of Evidence.  Additionally, as was determined in Samsung, such evidence may be admitted under rule 404(b).  But the probative value of the alleged misconduct is counterbalanced in large part by the possibility that introduction of such evidence will lead to "confusion of the issues," "mislead[] the jury," and has great potential to cause "undue delay" or otherwise waste time.  See Fed. R. Evid. 403.  This is especially the case

here, where the parties contest the extent of Ballard's duty to disclose prior art.  Resolution of

that dispute would force this proceeding into a collateral trial on what is invariably a complicated

issue of patent law.

Delineating an exact line concerning evidence of nondisclosure that accounts for both

relevancy and potential prejudicial effect is difficult outside of the context of a particular

evidentiary offering.  Accordingly, Defendants' Motion to Exclude Evidence and Argument

Relating to the Nondisclosure of the '325 Patent is GRANTED, provided that during trial the

court may allow properly confined questioning addressing this matter should the appropriate

circumstance arise.  In any event, any evidence of nondisclosure will be closely circumscribed to

avoid the creation of confusion and to ensure that time is not wasted on a collateral issue.

F.    *Motion to Strike the Expert Report of Mr. Russo and Preclude Him from Testifying as an Expert*

Mr. Russo has designated himself as an expert witness and has prepared an expert report

in that capacity.  Mr. Russo is apparently planning on testifying to four opinions that are outlined

in his expert report.  (See Expert Rep. of Ronald Russo 5, attached as Ex. 1 to Defs.' Mot. to

Strike the "Expert" Rep. of Plf. Ronald D. Russo & Preclude Him from Testifying as an Expert.)

Defendants challenge each of Mr. Russo's opinions  Specifically, Defendants assert that

Mr. Russo (1) attempts to interpret technical documents that the either the court should interpret

or that speak for themselves; (2) opines about the probability that Ballard independently

developed the allegedly misappropriated technology, even though Mr. Russo has not reviewed all

of the documentation relating to Ballard's research and development process; and (3) provides a

conclusory statement that one acknowledged distinction between Ballard's patent and Mr.

Russo's trade secret is immaterial.

Daubert, 509 U.S. 579, and Kumho Tire, 526 U.S. 137, require district courts to ensure

29

that offered expert testimony is "not only relevant, but reliable," <u>Daubert</u>, 509 U.S. at 589.  To adequately discharge this gatekeeping function, the court must "undertake whatever inquiry is necessary to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" <u>Smith v. Ingersoll-Rand Co.</u>, 214 F.3d 1235, 1243 (10th Cir. 2000) (quoting <u>Kumho Tire</u>, 526 U.S. at 152).

The court is unable at this time to provide a ruling without first being fully informed regarding Mr. Russo's qualifications and the testimony he seeks to offer in court.  As a result, the court has scheduled a hearing at which Mr. Russo will appear so that the court can make an appropriate assessment regarding admissibility and rule accordingly.  Therefore, the court takes this motion under advisement and will issue a ruling after the scheduled hearing.

G.      *Motion to Exclude Expert Opinion of Harry F. Manbeck*

The expert opinion of Mr. Manbeck is confined to a recitation of general patent law principles and an analysis of whether Ballard had a duty to disclose Mr. Russo's prior art when pursuing its patents.  As discussed in relation to the motion to exclude the testimony of Mr. Broadbent, it is the court that instructs the jury on the applicable law.  <u>See</u> <u>Vreeken</u>, 803 F.2d at 809 (stating that questions of law "are the subject of the court's instructions and not the subject of expert testimony").  Mr. Manbeck's application of the law to the facts of this case is also inadmissible as a result of the court's ruling regarding introduction of evidence relating to the duty to disclose prior art.  Because the court will not allow this trial to be unduly sidetracked by the issue of whether Ballard's conduct when prosecuting its patents was inequitable, the testimony of Mr. Manbeck on that point is irrelevant.

Accordingly, Defendants' Motion to Exclude the Expert Opinions and Testimony of

Plaintiff's Expert Harry F. Manbeck is GRANTED.

H.      *Motion to Exclude the Expert Opinion Offered by E. Robert Purdy*

Mr. Russo has designated E. Robert Purdy as an expert witness who will testify concerning the correlation between Mr. Russo's intellectual property and the Ballard patents that Mr. Russo alleges impermissibly incorporate that property.  Defendants challenge Mr. Purdy's report and testimony on the ground that he is not adequately qualified to offer an expert opinion on the technology in issue, and claims that he merely mimics the conclusions already drawn by Mr. Russo, which amounts to improper bolstering.

Daubert, 509 U.S. 579, and Kumho Tire, 526 U.S. 137, require district courts to ensure that offered expert testimony is "not only relevant, but reliable," Daubert, 509 U.S. at 589. To adequately discharge this gatekeeping function, the court must "undertake whatever inquiry is necessary to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1243 (10th Cir. 2000) (quoting Kumho Tire, 526 U.S. at 152).

To address the objections to Mr. Purdy's testimony raised by Defendants, a Daubert hearing is necessary.  The court has already scheduled the required hearing. Accordingly, this motion is taken under advisement, and the court will issue an appropriate ruling after Mr. Purdy appears and is examined at the hearing.

I.      *Motion to Strike Expert Opinion of Richard Hoffman*

Defendants seek to exclude the expert opinion of Mr. Russo's damages expert, Richard Hoffman, on the ground that his damages calculation used a royalty rate that was based upon incorrect assumptions.  Mr. Russo responds that Mr. Hoffman's report amounts to nothing more

31

than a calculation of how much money Ballard would have paid to Mr. Russo over the life of

Ballard's subsequently obtained patent assuming a three-percent royalty rate on sales of Ballard's

TrachCare 72 product,.  Mr. Russo states that the report is nothing more than a pure

mathematical calculation for the purposes of establishing a range for potential damages incurred

by Mr. Russo and that it does not purport to designate a reasonable royalty rate using standards

set forth in Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y.

1970).

Through the briefing, the parties have essentially reached an agreement that, so long as

Mr. Hoffman's testimony is limited to a damages calculation that assumes a three-percent royalty

rate, the testimony should be admissible.  Mr. Russo has indicated that he will establish the

propriety of the royalty rate through the introduction of other evidence.  Therefore, Mr. Hoffman

will be precluded from addressing whether that rate is reasonable.  Accordingly Defendants'

Motion to Strike Portions of the Expert Report of Richard Hoffman and to Exclude Portions of

His Testimony is GRANTED in part and DENIED in part.  Mr. Hoffman opinion will be

excepted in accordance with the parameters outlined above.

## Conclusion

For the reasons set forth above:

(1)     Plaintiff Ronald D. Russo's Motion in Limine to Exclude Evidence Concerning

Russo's 1978 Resume (dkt. # 117) is GRANTED.

(2)     Plaintiff Ronald D. Russo's Motion for Partial Summary Judgment that Drawing

No. 4 Is Covered by the Confidential Disclosure Agreement (dkt. # 119) is

GRANTED.

(3)     Defendants' Cross-Motion for Summary Judgment on Count II (dkt. #133) is

DENIED.

(4)     Defendants' Motion for Summary Judgment on Counts III and IV (dkt. # 140) is

DENIED.

(5)     Defendant Kimberly-Clark Corporation's Motion for Summary Judgment (dkt. #

142) is DENIED.

(6)     Defendants Motion for Summary Judgment (All Counts) (dkt. # 144) is DENIED.

(7)     Plaintiff Ronald D. Russo's Motion In Limine to Exclude Extrinsic Evidence

Concerning Interpretation of the Confidential Disclosure Agreement (dkt. # 149)

is GRANTED.

(8)     Plaintiff's Motion to Preclude Expert Testimony from Patent Attorney Bern S.

Broadbent (dkt. #171) is taken under advisement.

(9)     Plaintiff's Motion to Exclude Expert Testimony of Gordon W. Lassen (dkt. # 174)

is taken under advisement.

(10)    Defendants' Motion to Exclude Evidence and Argument Relating to the

Nondisclosure of the '325 Patent (dkt. # 184) is GRANTED to the extent

provided above.

(11)    Defendants' Motion to Strike the "Expert" Report of Plaintiff Ronald D. Russo &

Preclude Him from Testifying as an Expert (dkt. # 189) is taken under

advisement.

(12)    Defendants' Motion to Exclude the Expert Opinions and Testimony of Plaintiff's

Expert Harry F. Manbeck (dkt. # 196) is GRANTED.

(13)    Defendants' Motion to Strike the Expert Report of E. Robert Purdy and to

Exclude His Testimony (dkt. 199) is taken under advisement.

33

(14)     Defendants' Motion to Strike Portions of the Expert Report of Richard Hoffman
         and to Exclude Portions of His Testimony (dkt. # 201) is GRANTED in part and
         DENIED in part as outlined above.

(15)     Motion to Strike (1) Declaration of J. Patrick Samsel and (2) Declaration of John
         W. Frey, Jr. (dkt. # 248) is GRANTED.

The court has set a hearing for August 14, 2006, at 9:00 a.m., to evaluate the objections to the testimony of Mr. Broadbent, Mr. Russo, and Mr. Purdy.  After that hearing, the court will issue rulings on the motions taken under advisement in this order.

SO ORDERED this 10th day of August, 2006.

BY THE COURT:

TENA CAMPBELL
United States District Judge

34